UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                        :

LASHIFY, INC.,                       :

                         :

          Plaintiff,           :

                         :         25-cv-4183 (LJL)

      -v-                   :

                         :       OPINION AND ORDER

QINGDAO NETWORK TECHNOLOGY CO., LTD.  :
a/k/a QINGDAO FOLLOW THE TREND     :
NETWORK TECHNOLOGY CO., LTD. a/k/a    :
QINGDAO MARS CULTURE MEDIA CO., LTD  :
d/b/a UCOOLME and VIVICUTE LIMITED,   :

                         :

         Defendants.        :

                         :
------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff Lashify, Inc. ("Plaintiff" or "Lashify") is the assignee of U.S. Patent No. 11,253,020 (the "'020 Patent") and U.S. Patent No. 12,171,290 (the "'290 Patent") for artificial lash extensions. Dkt. No. 9 ¶¶ 14–15. "The '020 Patent claims an artificial lash extension system including multiple lash extensions that are designed to attach to an underside of a user's natural lashes. Each of the lash extensions includes clusters of artificial hairs with 1) at least two artificial hairs; and 2) a base from which the at least two artificial hairs protrude. The '020 Patent also claims that at least some of the artificial hairs are connected to one another at the base by at least an application of heat." *Id.* ¶ 14. The '290 patent claims an artificial lash extension system including multiple lash extensions, each including 1) a knotless base; 2) a plurality of clusters having two or more artificial hairs; and 3) a first adhesive that joins ends of the clusters to the knotless base. *Id.* ¶ 15. The '290 patent also claims that "the knotless bases of the plurality of lash extensions are designed to attach to an underside of a user's natural eyelashes of an eye with a second adhesive." Dkt. No. 71-3; *see* Dkt. No. 9 ¶ 15. Lashify is also the assignee of two

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/22/2025

design patents: D1,009,374 (the "D'374 Patent") and D989333 (the "D'333 Patent" and with the D'374 Patent, the "Design Patents").  Dkt. No. 9 ¶¶ 17, 78.

On June 10, 2025, Lashify brought suit against Defendants Qingdao Network Technology Co., Ltd. a/k/a Qingdao Follow The Trend Network Technology Co., Ltd. a/k/a Qingdao Mars Culture Media Co., Ltd. d/b/a UCOOLME and Vivicute Ltd. ("Defendants"), claiming patent infringement in violation of 35 U.S.C. § 271.  Dkt. No. 10.  Lashify claims that Defendants are selling and marketing products that infringe Claims 1, 3, and 5–6 of the '020 Patent, literally and/or under the doctrine of equivalents, Dkt. No. 9 ¶ 66, and infringe every limitation of at least claims 1 and 7–8 of the '290 Patent, literally and under the doctrine of equivalents, *id.* ¶ 73.  Plaintiff further asserts that Defendants infringe the ornamental design claims of the Design Patents.  *Id.* ¶¶ 79–80.

The matter is now before the Court on claim construction.  The claim limitations in the '020 Patents have been the subject of *Markman* hearings in two other proceedings.  In *Lashify, Inc. v. Qingdao Lashbeauty Cosmetic Co.*, 6:22-cv-00776-ADA-DTG, and *Lashify, Inc. v. Qingdao Hollyren Cosmetics Co., Ltd.*, 6:22-cv-00777-ADA-DTG, Judge Gilliland in the United States District Court for the Western District of Texas determined that the claim limitations in the Lashify Patents should be given their plain and ordinary meaning.  Dkt. No. 71-7.  Likewise, in *Lashify, Inc. v. Urban Dollz, LLC*, No. 2:22-cv-6148 GW-AFMx, Judge Wu in the United States District Court for the Central District of California determined that the claim limitations should be given their plain and ordinary meaning.  Dkt. No. 71-8.

Plaintiff filed a first claim construction statement in this case on September 12, 2025.  Dkt. No. 71.  The statement was supported by the expert reports of Vivian Baker and Samuel Gido.  Dkt. Nos. 71-4, 71-9.  Defendant filed a claim construction statement on September 26,

2

2025.  Dkt. No. 81.  Plaintiff filed a second claim construction statement and reply on October 15, 2025.  Dkt. No. 85.  The Court held a hearing on November 10, 2025.  Minute Entry for Nov. 10, 2025.

## LEGAL STANDARD

Patent infringement analysis entails two steps: the first step is known as claim construction or interpretation and requires the Court to determine the meaning and scope of the patent claims; the second step requires the fact finder to compare the properly construed claims to the device or product accused of infringing.  *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996).

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  "The purpose of claim construction is to resolve 'disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement' or invalidity."  *Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1380 (Fed. Cir. 2024) (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

Claim construction also serves a public purpose—the Supreme Court has "emphasized that the public is entitled to be apprised of what is and is not protected by a particular patent and that that is the purpose of claims."  *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999) (citing *Markman*, 517 U.S. at 371).  "A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention."  *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 868 F.2d 1251, 1257 (Fed. Cir. 1989).  The scope of a patent's claims therefore must "be sufficiently definite to inform the public of the bounds of the protected invention, *i.e.,*

what subject matter is covered by the exclusive rights of the patent.  Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

"[T]he construction of a patent claim is a matter of law exclusively for the court." *Markman*, 52 F.3d at 977.  "[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips*, 415 F.3d at 1312 (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art [a "POSITA"] in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313.  That is because "inventors are typically persons skilled in the field of the invention and [] patents are addressed to and intended to be read by others of skill in the pertinent art." *Id.*

The court must "read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent." *Id.*; *accord SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195 (Fed. Cir. 2013).  Indeed, when construing a claim, the court must first and primarily rely on intrinsic evidence, "which is usually dispositive." *SkinMedica*, 727 F.3d at 1195.  Intrinsic evidence includes the patent's specification, which provides a written description of the invention and the manner and process of making and using it.  35 U.S.C. § 112; *see Atl. Rsch. Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1353 (Fed. Cir. 2011) (the specification describes "the inventor's contribution to the field of art").  However, "[t]he written description part of the specification itself does not delimit the right to exclude.  That is the function and purpose of claims." *Markman*, 52 F.3d at 980.  Importantly, "although the specification often describes very specific embodiments of the invention," a claim is not to be construed as limited to those embodiments.  *Phillips*, 415 F.3d at 1323.  The Federal Circuit has

"expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Id.*  In sum, the specification provides guidance and context for construing claims but does not limit claims to the embodiments that it describes.

Likewise, the court "should also consider the patent's prosecution history, if it is in evidence," *Markman*, 52 F.3d at 980, as the prosecution history also constitutes intrinsic evidence, *SkinMedica*, 727 F.3d at 1195.  "The prosecution history . . . consists of the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317.  Although the prosecution history "is less useful for claim construction purposes" than the specification, it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

Courts may additionally consider extrinsic evidence, but "such evidence is generally of less significance than the intrinsic record." *Endo Pharmaceuticals Inc. v. Actavis, LLC*, 922 F.3d 1365, 1371 (Fed. Cir. 2019).  If the analysis of intrinsic evidence alone resolves any ambiguity in a disputed term, it is improper to rely on extrinsic evidence. *See Vitronics Corp.*, 90 F.3d at 1583.  This restriction on extrinsic evidence serves to promote public understanding of a patent's claims—the material used to adduce the meaning of a patent's claims should be available from the public record of the patent.  As explained by the Federal Circuit in *Vitronics*, "competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention.  Allowing the public record to be altered or changed by extrinsic evidence introduced

at trial, such as expert testimony, would make this right meaningless." 90 F.3d at 1583 (internal citation omitted). Extrinsic evidence, such as dictionaries and expert testimony, is thus considered "less reliable than the patent and its prosecution history in determining how to read claim terms," *SkinMedica, Inc.*, 727 F.3d at 1195, and "may not be used to vary or contradict the claim language," *Vitronics*, 90 F.3d at 1584.

There are only two exceptions to the general rule that claim terms are "given their plain and ordinary meanings to one of skill in the art when read in the context of the specification and prosecution history . . . 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution," which is known as specification or prosecution disclaimer or disavowal. *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *see Phillips*, 415 F.3d at 1316 (the specification "may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess" or "may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor"). Both specification and prosecution disclaimer must be "clear and unmistakable." *Golden Bridge*, 758 F.3d at 1365; *accord Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513 (Fed. Cir. 2015); *see id.* ("To find disavowal, we must find that the specification is both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer." (internal quotation marks and citation omitted)).

## DISCUSSION

### I.    Claim Construction for '020 and '290 Patents

Lashify contends that the claim language for both the '020 and '290 patents is readily understandable and requires no construction and should be assigned its "plain and ordinary

meaning." Dkt. No. 71 at 5. Defendants propose construction for five sets of terms across the

'020 and '290 patents. Dkt. No. 81 at 3–12. The Court will analyze each proposed construction

in turn.

### A. "designed to attach adjacent to one another at an underside of natural lashes" / "designed to attach to an underside of natural eyelashes of an eye"

Claim 1 of the '020 Patent states:

An artificial lash extension system comprising: a plurality of lash extensions designed to attach adjacent to one another at an underside of natural lashes, each of the plurality of lash extensions comprising a plurality of clusters of artificial hairs, each of the plurality of clusters comprising at least two artificial hairs; and a base from which the at least two artificial hairs of each of the plurality of clusters protrude, wherein at least some of the artificial hairs are connected to one another at a respective part of the base by at least an application of heat.

Claim 1 of the '290 Patent states:

An artificial lash extension system comprising: a plurality of lash extensions, each comprising: a knotless base; a plurality of clusters of two or more artificial hairs; and a first adhesive that joins ends of the plurality of clusters to the knotless base; where the knotless bases of the plurality of lash extensions are designed to attach to an underside of natural eyelashes of an eye with a second adhesive.

Defendants request claim construction of the language "designed to attach adjacent to one

another at an underside of natural lashes" in the '020 Patent and "designed to attach to an

underside of natural eyelashes of an eye" from the '290 Patent. Plaintiff asserts that the claim

limitation should be given its plain and ordinary meaning and that no claim construction is

needed. Defendants assert that the limitation should be construed as "having the capability to

attach at an underside, i.e., at or below the root, of one or more natural lashes." Dkt. No. 71 at

10. Plaintiff claims that the claim language has no special meaning and is readily understandable

to a POSITA—the lash extensions are attached under the natural lashes, that "designed to" is a

common patent law term comparable to "configured to," and that the term "root" should not be

improperly imported into the claims. Dkt. No. 71 at 10–11. Defendants assert that a skilled artisan would understand before the filing dates of the patents "that a false lash system that was designed for attachment above natural lashes (i.e., a strip lash) was equally designed for attachment to the underside of natural lashes." Dkt. No. 81 at 4. Defendants also argue that Plaintiff's argument imports into the claim the notion that the invention subjectively be intended to be used in a specific manner.[1]

The Court first considers whether the phrase "designed to" should be construed to mean "having the capability to." The Federal Circuit has addressed the question, at least indirectly, in three separate cases. In *In re Man Mach. Interface Techs. LLC*, 822 F.3d 1282, 1286 (Fed. Cir. 2016), *In re Giannelli*, 739 F.3d 1375, 1379 (Fed. Cir. 2014), and *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012), the Federal Circuit was confronted with the question how to construe the term "adapted to." In all three cases, the court held that the term could be construed generally to mean "'made to,' 'designed to,' or 'configured to'" or "more broadly to mean 'capable of' or 'suitable for.'" *In re Man Mach.*, 822 F.3d at 1286 (quoting *In re Giannelli*, 739 F.3d at 1379); *Aspex Eyewear, Inc.*, 672 F.3d at 1349. The court thus (1) equated "designed to" to "configured to"; (2) concluded that "designed to" has a meaning different from and narrower than "capable of" and (3) presumed that such meaning was definite. In particular, the Federal Circuit has understood that "designed to" means that the invention is "designed or configured to accomplish the specified objective, not simply that [it] can be made to serve that purpose." *Aspex Eyewear*, 672 F.3d at 1349.

---

[1]At oral argument, Defendants also argued for their proposed construction based on the prosecution history of a related patent, U.S. Patent Ser. No. 11,290,260, but this prosecution history is not in evidence and therefore will not be considered. *Markman*, 52 F.3d at 980 ("To construe claim language, the court should also consider the patent's prosecution history, if it is in evidence"); *Vitronics*, 90 F.3d at 1582 (same).

Defendants object that such interpretation impermissibly incorporates a subjective notion into the claim and thus would render it indefinite.  Defendants suggest that the term "designed to" must be read as "capable of" in order to avoid the "gray zone" where the public would be uncertain of the claim's scope—a definition based on the inventor's particular subjective intent would fail to inform the public of the claim's metes and bounds.  *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909 (2014) ("[A] patent must be precise enough to afford clear notice of what is claimed, thereby appraising the public of what is still open to them." (internal quotation marks and citations omitted)).  In theory, the patent's scope also could expand or contract as necessary to meet a defense: becoming either so broad as to meet the argument that the defendant's product did not infringe or sufficiently narrow to avoid a challenge that it was anticipated by prior art.  *See id.* (noting that without a definiteness check, patent applicants are incentivized "to inject ambiguity into their claims").

The Federal Circuit has rejected the argument that "designed to" necessarily is equivalent to the inventor's own particular, and perhaps idiosyncratic, subjective intent.  Though "designed to" indicates purpose, the Federal Circuit has suggested that it does not introduce a subjective element into the claim.  *See Cochlear Bone Anchored Solutions AB v. Oticon Medical AB*, 958 F.3d 1348, 1356 (Fed. Cir. 2020) (rejecting the contention that the language "specifically adapted to" requires a particular intent and stating "[w]e have previously held that the claim term 'adapted to' generally means 'made to,' 'designed to,' or 'configured to' perform the stated function, and we have not introduced a subjective element into the construction of the phrase.").  A jury can determine based on the language of the patent as a whole, including the specification, whether a product has been designed to achieve a particular objective.  The Federal Circuit in *Cochlear* cited to *Aspex Eyewear, In re Man,* and *In re Giannelli* as examples of construing a

9

term to mean "made to" or "designed to" without introducing a subjective element.  In *Aspex Eyewear*, the Federal Circuit construed a patent for magnetic clip-on eyewear that claimed an invention in which the arms and magnetic members of the auxiliary frames are "adapted to extend across respective side portions of a primary spectacle frame."  *Id.* at 1348.  Plaintiff-appellant argued that the district court had construed the limitation too narrowly when interpreting the term "adapted to" as "made to extend across the top of the respective side portions of the primary frame."  Plaintiff argued instead that the language should be interpreted to claim any device that was "suitable for," *i.e.*, capable of, extending across the side portions of the primary frame.  *Id.*  The Circuit rejected that argument, noting that though the language "adapted to" could be read to mean either "made to" or "designed to" or alternatively "capable of" or "suitable for," the context of the phrase "adapted to" within the claim supported the district court's conclusion that the narrower interpretation of "made to" or "designed to" applied.  *Id.*  Looking to the specification, the Circuit noted that it described the magnetic members of the auxiliary frame as being "for engaging" with the magnetic portions of the primary frame, which suggests that they "are meant to engage . . . not simply that they are capable of doing so."  *Id.* at 1349.  Implicit in the court's ruling was that the phrase "designed to" has a different meaning than "capable of" and that such meaning can be determined from the claim language itself.  The Circuit did not rely on the subjective intent of the inventor, but rather discerned from the intrinsic evidence of the patent that "adapted to" should be construed as "designed or configured to accomplish the specified objective," giving it an interpretation different than "capable of."  *Id.*

In *In re Man Machine,* the Circuit evaluated a claim for a remote control device that required that "the body of the device be 'adapted to be held by the human hand'" and required "a multi-function 'thumb switch being adapted for activation by a human thumb.'"  822 F.3d at

1284. The patent examiner had construed the term "adapted to be held by the human hand" to include "various 'forms of grasp or grasping" and the term "thumb switch" as "merely requir[ing] that a switch . . . be capable of being enabled/activated by a thumb." *Id.* at 1285. Based on this construction, the examiner rejected the claim as anticipated and obvious based on prior art that disclosed a desk-bound mouse, which could be grasped by the hand and activated by the thumb. The Federal Circuit rejected the examiner's claim construction as "unreasonably broad" and reversed its anticipation rejection. *Id.* at 1286. The court reiterated that while "adapted to" could mean "capable of" or "suitable for," it "generally means 'made to,' designed to,' or "configured to.'" *Id.* at 1286. The court held that the patent for the remote control device was best understood to claim a device that was made or designed to be held in the human hand with a thumb switch made or designed for activation by a human thumb," and not to include simply any device that could be held in the human hand and activated by the thumb. *Id.* To reach this conclusion, the Circuit relied on the description within the specification, noting that it "expressly distinguishes the remote control device from a desk-bound device," and describes "how the body of the remote control device is preferably elongated and rounded to be held in the hand," how "the hand 'with the help of palm and its fingers grips the Remote control device body,'" and that "the index finger switch is positioned on the opposite side of the thumb switch, to naturally align with the index finger position when the remote control device is held in the hand,"

The Federal Circuit's decision in *In re Giannelli* also affirms this distinction between "designed to" and "capable of." In *In re Giannelli*, the Circuit evaluated a patent for a rowing exercise machine which the Patent Trial and Appeal Board ("Board") had rejected as obvious over a prior patent for a chest press machine. 739 F.3d at 1379. The claims in the patent require

11

a "first handle portion adapted to be moved . . . by a pulling force . . . in a rowing motion" and the Board determined that since the previously-patented chest press machine could be used as a rowing machine if the user faced the handles rather than sitting behind them, the patent was obvious. *Id.* at 1378–79. However, that the chest press machine was capable of being used as a rowing machine did not mean that it was equivalent to a machine *designed for* that purpose. Reversing the Board's decision, the Circuit found that the Board erred in interpreting "adapted to" as merely "capable of" instead of "designed to." *Id.* at 1379. The Circuit rejected the Board's argument that using the chest press machine as a rowing machine "was a new intended use of the prior art apparatus" that rendered the rowing machine obvious. *Id.* The intended use of the machine was irrelevant for determining whether both machines were "designed for" use with a pulling motion. Instead, the Circuit looked to the specification of the rowing machine patent, which describes how the position of the handles enable the user to maintain biomechanical alignment while using the machine. *Id.* at 1379–80. The Circuit noted that "[t]he location of those handles relative to the other components is one of their structural attributes that enables performance of the rowing motion against the selected resistance." *Id.* at 1380. The term "designed to" thus has meaning distinct from either "capable of" or the subjective undisclosed intent of the inventor. It indicates that the invention is "configured to accomplish the specified objective." *Aspex Eyewear*, 672 F.3d at 1349. It does not generate a "zone of uncertainty" that categorically deprives a claim of definiteness or that requires construction as "capable of."

"Designed to" can be given its plain and ordinary meaning as understood by a POSITA. A POSITA can distinguish between a set of eyelash extensions that are made to attach at an underside of natural lashes of an eye and those that are designed to attach at other parts of the

12

eye.  The Court thus credits the testimony of Plaintiff's expert, Ms. Baker, that "a POSITA . . . would be able to distinguish between lashes designed for this application method [underneath the lashes] as compared to others that are designed solely for application to other areas of the eye." Dkt. No. 71-4 at 7:24–28.  She describes different forms of artificial lash extensions and notes how their distinct features lead to different types of application.  Dkt. No. 71-4 at 7.  For instance, she describes that cluster lashes have "a small 'point' base that adheres to the individual lashes or between them."  *Id.* at 7:17–18.  In contrast, "strip lashes . . . were applied to the skin of the eyelid . . . [and] their structure required a sufficient surface area at the 'base,' so that a user could apply glue to the base and the contact between the eyelid, the glue, and the base would hold the strip lash in place on the eyelid."  *Id.* at 7:20–24.  She distinguishes cluster lashes and strip lashes, which "were applied to *other* areas" of the eye, with the lashes claimed in the patent that are designed for application underneath the natural lashes.  *Id.* at 7:11–12.

Defendants' expert, Ms. Kindall, implicitly recognizes the difference between lash extensions that are designed to attach at the underside of the eye and "lash extensions [that] had been designed for placement above the natural lashes of a user."  Dkt. No. 66 ¶ 6.  She opines that persons of skill can be "taught how to apply lash extensions [designed for placement above the natural lashes of a user] to the underside of the wearer's natural lashes."  Dkt. No. 66 ¶ 6.  In other words, she notes that persons of skill could learn to apply lashes underneath the natural lashes, even if they were not designed for that application.  Indeed, she also states that whether a product is "designed for" a certain application is "not contingent on what is instructed," *i.e.*, the intent of the inventor.  Dkt. No. 66 ¶ 59.

Lastly, the language of the specification does not support a finding that Lashify disclaimed "designed to" in favor of the broader definition "capable of."  *See Thorner v. Sony*

13

*Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) (standard for specification disclaimer is "exacting" and requires "clear and unmistakable disclaimer").  The specification of the '020 and '290 patents[2] repeatedly describes the lash fusions as applied to the underside of the natural eyelashes and describes no other form of application.  Dkt. No. 71-2 at 1:22–24; 5:44–49; 6:53–54.  The specification also identifies features of the lash fusions that "enable[]" the user to attach them to the underside of the eye.  Dkt. No. 71-2 at 3:51–57; 5:50–53, 7:1–3.  For instance, it notes that "an adhesive may be applied to the top of each lash fusion within a set during the manufacturing process, which *enables* an individual to easily apply the set of lash fusions directly to the underside of the individual's eyelashes rather than to the individual's eyelid."  Dkt. No. 71-2 at 3:51–55 (emphasis added); *see Aspex Eyewear, Inc.*, 672 F.3d at 1349 (noting the specification's use of "for engaging" when construing "adapted to" as "designed to").  The specification offers support for the plain and ordinary meaning of "designed to," and includes no indication, much less a clear and unmistakable one, that Plaintiff intended to disavow the scope of the claim.

The Court therefore construes "designed to" to have its plain and ordinary meaning of "tailored for a specified objective."

Defendants' proposed construction also seeks to construe the term "underside" as "at or below the root" of the natural lashes.  A claim term is given its plain and ordinary meaning unless the patentee sets out a definition for the term or the patentee disavows the full scope of the claim term.  *Golden Bridge Tech.*, 758 F.3d at 1365.  Defendants offer no argument in support of their proposed construction, *see* Dkt. No. 81 at 3–5, and the Court finds no evidence that Plaintiff sought to give the term "underside" a special meaning or otherwise disavowed the full scope of

---

[2] The '020 and '290 patents share a specification.  Dkt. No. 71 at 5.

the claim. "Underside" is a readily understandable term to a POSITA and lay person alike. It does not require construction, as it is a "commonly used term[] . . . used in common parlance and has no special meaning in the art." *Summit 6, LLC v. Samsung Electronics Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015). The proposed construction "at or below the root" would not clarify or explain the meaning of "underside." *See Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) ("[T]he construction of claims is simply a way of elaborating the normally terse claim language[] in order to understand and explain, but not to change, the scope of the claims" (quoting *Scripps Clinic v. Genentech, Inc.*, 927 F.3d 1565, 1580 (Fed. Cir. 1991)) (alteration in original)). Instead, it would improperly expand the scope of the term: "at the root" could reasonably include placement above the lashes, which directly contradicts the term "underside." *See id.* The Court will therefore not adopt Defendants' proposed construction.

The plain and ordinary meaning of the disputed claim language is clear and well-established, and Plaintiff did not clearly and unmistakably disavow the full scope of "designed to." Therefore, claim construction is not needed.

### B.      "a base"/ "a knotless base"

Claim 1 of the '020 Patent recites: "a base from which the at least two artificial hairs of each of the plurality of clusters protrude." Dkt. No. 71-2 at 9:15–16. Claim 1 of the '290 patent recites that the artificial lash extension system comprises "a plurality of lash extensions, each comprising: a knotless base." Dkt. No. 71-3 at 9:25–27. Plaintiff argues no construction is needed for the term "base" or "knotless base," which should be given its plain and ordinary meaning. Its expert, Ms. Baker, opines that "[t]he term 'base' when used with artificial lashes refers to the bottom part of the artificial lashes, the end product," which is closest to the eye, and from which the hairs fan out to extend the natural lashes. Dkt. No. 71-4 ¶ 17.

15

Defendants argue that both the terms "base" and "knotless base" should be construed to exclude "'conventional' lash extensions that use a string or other strip of material to connect the artificial hairs to one another." Dkt. No. 81 at 6. It bases its argument on language in the specification that distinguishes the invention from "[c]onventional clusters [that] use a string at the base to connect the artificial hairs to one another." Dkt. No. 71-2 at 5:18–20. It also relies on prosecution history of a related patent to argue that Plaintiff had previously disclaimed the conventional "base" as identified in pieces of prior art. Dkt. No. 81 at 6–9. It relies on the doctrines of specification disclaimer and prosecution history disclaimer. Defendants also argue that both terms should be construed to require that the base have "no quantifiable weight" and that the term "knotless base" should be further construed as "a final product that does not have any knots in the material forming it." Dkt. No. 81 at 9–10.

"Claims must be read in view of the specification, of which they are a part." *Markman,* 52 F.3d at 979; *see also Slimfold Mfg. Co. v. Kinkead Indus., Inc.,* 810 F.2d 1113, 1116 (Fed. Cir. 1987) ("Claims are not interpreted in a vacuum, but are part of and are read in light of the specification."). "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.,* 232 F.3d 877, 882 (Fed. Cir. 2000). "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). On the other hand, where the specification makes clear that the invention does include a particular embodiment, the claim is not limited to that embodiment. Rather, the embodiment serves to explain and describe the invention. *See Fuji*

16

*Photo Film Co., Ltd. v. Int'l Trad Com'n*, 386 F.3d 1095, 1106 (Fed. Cir. 2004) (the scope of the claim is not limited to the particular method of loading film described in the specification, absent clear indication that the invention was limited to that sole method).

"The standard for disavowal of claim scope is . . . exacting." *Thorner*, 669 F.3d at 1366. Disclaimer must be "clear and unmistakable." *Id.* at 1367. "Disavowal requires that 'the specification make[] clear that the invention does not include a particular feature.'" *Openwave*, 808 F.3d at 513 (quoting *SciMed*, 242 F.3d at 1341). "To find disavowal of claim scope through disparagement of a particular feature, we ask whether 'the specification goes well beyond expressing the patentee's preference . . . [such that] its repeated derogatory statements about [a particular embodiment] reasonably may be viewed as a disavowal.'" *Id.* (quoting *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012)). "Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal." *Thorner*, 669 F.3d at 1366.

The shared specification of the '020 and '290 patents describes multiple points in the creation of the claimed invention where artificial lashes are connected to one another. First, artificial hairs are connected to form "clusters" of artificial hairs. Dkt. No. 71-2 at 2:49–51. These clusters can be formed through, *inter alia*, a hot melt method, *id.* at 2:52–53, or by tying the artificial hairs within the cluster to a support thread, *id.* at 4:31–33. Second, the clusters of artificial hairs are then fused together to form a "lash fusion." *Id.* at 2:61–62. The specification notes that the fusion of multiple clusters to one another "provides several advantages over conventional clusters of lash extensions." Dkt. No. 71-2 at 12–15. One of these advantages is that in the claimed invention "the multiple clusters can be heat sealed to one another," whereas conventional clusters "use a string at the base to connect the artificial hairs to one another,"

17

which "causes the total height at the base of the cluster to exceed 0.3 mm." *Id.* at 5:16–21. Defendants argue that this statement disclaims the use of a string or other strip of material to connect the artificial lashes to one another.

Defendants' proposed exclusion reaches too broadly. The specification draws a distinction between "conventional clusters [that] use a string at the base to connect the artificial hairs to one another," Dkt. No. 71-2 at 5:18–19, and the claimed invention wherein the multiple clusters within a lash fusion "can be fused to one another," *id.* at 5:11–12. However, the specification also specifically provides for the use of a string to connect the lashes within the lash clusters to one another. The specification contemplates an embodiment where "some or all of the artificial hairs within a cluster may be tied to a support thread." Dkt. No. 71-2 at 4:31–32. Defendants' construction, which excludes from the claim lash extensions that use a string to connect artificial hairs to one another, would exclude this stated embodiment. The exclusion of a disclosed embodiment weighs heavily against adopting Defendants' construction. *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1381 (Fed. Cir. 2018) (noting the strong presumption against constructions that would exclude a disclosed embodiment). This embodiment also squarely contradicts Defendants' claim that Plaintiff disavowed the use of a string or strip of material in connecting the lashes. That the specification stated that the claimed invention provides an advantage over conventional clusters' use of string at the base does not clearly and unmistakably disavow any use of string to connect lashes to one another. *Cf. Openwave*, 808 F.3d at 514 (finding disclaimer where the specification was "rife with remarks" disparaging the design feature and those "remarks permeate[d] the specification"); *Loftex USA v. Trident Ltd*, 957 F. Supp. 2d 375, 384 (S.D.N.Y. 2013) (finding disclaimer for use of PVA where

18

specification "flatly states that the method 'does not use' PVA and 'eliminates the dependence on PVA'").

Defendants' reliance on prosecution disclaimer is also unavailing.  Prosecution disclaimer, as with specification disclaimer, must be "clear and unmistakable." *Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016).  Defendants point to the prosecution history of a related patent application, US Application Ser. No. 16/575,894 ("'894 application"), that contains the same specification language regarding the "conventional lashes [that] use a string at the base to connect the artificial hairs to one another."  Dkt. No. 81 at 7–8. The portion of the prosecution history that Defendants quote states:

> The Applicant respectfully submits that Choe does not specifically describe or suggest each of the elements of claims 1, 15, and 23, as cited above, as Choe merely describes that "[t]o complete the manufacturing of the artificial lashes, a strip of lashes, such as shown at 32 in FIG. 5, is cut, trimmed, and curled to the desired length and fashion depending on the intended application. Likewise, the strip 32 of lashes can be separated into clusters, such as clusters 34 as shown in FIG. 6" See Choe, 3:54–59.

Dkt. No. 81 at 8.  Defendants state that the claims at issue in the '894 application, claims 1, 15, and 23, recite the term "base."  *Id.*  Defendants also reproduce Figures 5 and 6 from the prior art patent, "Choe," referenced in the prosecution history above.  *Id.*  Considering these figures and Lashify's above statement, Defendants conclude that "Lashify had argued to the USPTO [United States Patent and Trademark Office] that the claimed 'base'" present in the '894 application, '020 Patent, and '290 Patent does not include the types of lashes identified in Choe.  The language of the '894 claims, as described in the referenced prosecution history, is reproduced below:

> As amended, claim 1 recites, among other things, 'the first base and the second base are included in a common base from which the first cluster of artificial hairs and the second cluster of artificial hairs are spaced apart from each other along the common base.

As amended, claim 15 recites, among other things 'a plurality of clusters of artificial hairs (i) extending from the base and (ii) being spaced apart from each other along the base, each of the clusters including at least two hairs, each of the clusters being heat fused to form the base.

As amended, claim 23 recites, among other things, 'the first cluster of artificial hairs and the second cluster of artificial hairs being linearly heat fused to a common base spanning between the first proximal end portions and the second proximal end portions.

*Lashify, Inc. v. Qingdao Serafina International Trade Co., Ltd*, No. 25-cv-1485, Dkt. No. 26-5 at 8 (S.D.N.Y. filed May 12, 2025).

Defendants' argument fails for multiple reasons.  First, there is no evidence that Lashify specifically argued to the USPTO that the claims in the '894 application exclude the type of base present in the artificial lashes identified in Choe.  Instead, Lashify argued that Choe "does not specifically describe or suggest *each* of the elements" of the claims, Dkt. No. 81 at 8 (emphasis added), and that "Choe does not specifically describe *all features* of claims 1, 15, and 23," *Lashify, Inc.*, No. 25-cv-1485, Dkt. No. 26-5 at 8 (emphasis added).  The claims of the '894 patent describe a "base," but also recite additional elements, such as the position of lash clusters and the number of hairs in the clusters.  *Id.*  Lashify's submission that these claims are not anticipated by Choe depended on each of the elements present in the claims, not simply the term "base."  Second, even if Lashify specifically disavowed the type of base at issue in Choe, Defendants do not demonstrate that the disavowal would be relevant to their proposed exclusion. Defendants do not assert that the base at issue in Choe used a string or other strip of material to connect the lashes together.  There is no information regarding what type of base Lashify is argued to have disclaimed.  Lashify's statement that the claims of its '894 patent are not anticipated by Choe do not provide the "clear and unmistakable" disclaimer required for prosecution disclaimer.

20

Moreover, the '894 application, though prosecuted by Lashify, is not listed as a related application in either the '020 or '290 patents, Dkt. No. 71-2; Dkt. No. 71-3, nor does it contain the same claim limitations that the Court is construing in the '020 or '290 patents. The prosecution history of a different patent is relevant where that patent is related to the patent at issue and contains the same limitation. *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent . . . applies with equal force to subsequently issued patents that contain the same claim limitation"); *cf. Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1315 (Fed. Cir. 2001) (declining to consider prosecution history of a related patent where none of the claims contained the same limitation that the court was construing). Here, Defendants provide no information regarding how the '894 application relates to either the '020 or '290 patents, and the claims at issue in the '894 application differ significantly from the claims at issue here. "The doctrine of prosecution disclaimer generally does not apply when the claim term in the descendent patent uses different language." *Ventana Med. Sys., Inc. v. Biogenex Lab'ys, Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) (citing cases); *see also ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed. Cir. 2003) (parent patent's "prosecution history is irrelevant to the meaning of this limitation because the two patents do not share the same claim language"). The prosecution history of the '894 application therefore has no bearing on the Court's construction of the terms "base" and "knotless base."

There is no "clear and unmistakable" disclaimer of the use of string or other strip of material to attach the artificial hairs to one another in either the specification or the prosecution history of the '020 or '290 patents. The Court therefore declines to adopt Defendants' proposed

construction that would exclude "conventional" lash extensions that use a string or other strip of material to connect the artificial hairs to one another.

Defendants' proposed construction of "knotless base" as "a final product that does not have any knots in the material forming it" would also improperly exclude a disclosed embodiment. *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) ("[O]ur court has cautioned against interpreting a claim term in a way that excludes disclosed embodiments . . . ."); *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) ("A claim construction that excludes a preferred embodiment, moreover, 'is rarely, if ever, correct.'") (*quoting Vitronics*, 900 F.3d at 1583). The specification includes an embodiment wherein "some or all of the artificial hairs within a cluster may be tied to a support thread (i.e., knotted)." Dkt. No. 71-3 at 4:46–48. Defendants' construction goes beyond defining the term "base" and instead imports limitations to the product as a whole: while the claim specifies a "knotless base," Defendants propose a construction that requires the entire "final product" and not just the "base" to be knotless. Such a construction would exclude the disclosed embodiment where artificial hairs within a cluster are knotted. As "there is a strong presumption against a claim construction that excludes a disclosed embodiment," *Nobel Biocare Servs. AG*, 903 F.3d at 1381, the Court will not adopt Defendants' proposed construction. *See also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (rejecting proposed construction that would exclude disclosed embodiments); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1369 (Fed. Cir. 2003) (finding district court's construction erroneously excluded an example provided in the specification).

Lastly, Defendants propose construing "base" and "a knotless base" as having "no quantifiable weight," in reference to the specification's description that one of the advantages of

the lash fusions over conventional clusters is that the lashes have "no quantifiable weight." Dkt. No. 81 at 6; Dkt. No. 71-2 at 5:11–15. The purpose of claim construction is to "explain[] and defin[e] terms in the claims," *Abbott Laboratories v. Sandoz, Inc.*, 544 F.3d 1341, 1360 (Fed. Cir. 2008) and "[a] basic principle of claim construction is that 'the words of a claim are generally given their ordinary and customary meaning,'" *Source Vagabond Sys. Ltd. V. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) (quoting *Phillips*, 415 F.3d at 1312). "While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013); *see id.* ("The district court erred by reading claim 45 narrowly to encompass only those connections . . . specifically described in the specification"). Adding the requirement that the base have "no quantifiable weight" would not clarify the meaning of the term "base" and instead would improperly import a limitation from the specification into the claim. *See Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 906 (Fed. Cir. 2005) ("The court must take care in its analysis, when locating in the written description the context for a disputed term, not to import a limitation from that written description."); *see also Rambus Inc. v. Infineon Tech. Ag*, 318 F.3d 1081, 1089 (Fed. Cir. 2003) ("The district court's construction did not merely clarify or construe the actual words of the claim. . . . the court's construction reads into the claim two new limitations not required by the claim language"). Adding the limitation of "no quantifiable weight" does not aid an individual in identifying the "base" of an artificial lash system. *See Baxter International, Inc. v. CareFusion Corporation*, 2019 WL 1897063, at *4 (N.D. Ill. Apr. 29, 2019) ("When a claim has

a facially plain and ordinary meaning, the Court's inquiry ends." (citing *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1361 (Fed. Cir. 2013)).[3]

Defendants' proposed constructions do not clarify the meaning of the terms "a base" or "a knotless base" and instead would improperly impose limitations on the claims and exclude disclosed embodiments.  As "base" and "knotless" have readily understood meanings to a POSITA, no claim construction is required.

### C.    "application of heat"

Claim 1 of the '020 Patent recites: "at least some of the artificial hairs are connected to one another at a respective part of the base by at least an application of heat."  Claim 3 of the '020 Patent recites "the base of each of the plurality of lash extensions is formed by at least the application of heat."

Lashify contends that no claim construction is required and the language should be given its plain and ordinary meaning.  Defendants contend that the claims should be construed as "the artificial hairs are connected via lash fusion whereby the melted artificial hair material forms the base for the final product" and should exclude "conventional" lash extensions that use a string or other strip of material to connect the artificial hairs to one another.  Defendants thus would read into the claim the requirement that (i) the application of heat result in the melting of the artificial hair and (ii) that such melting form the base of the lash system.

---

[3] Defendants raised for the first time at oral argument two additional arguments in support of its construction of "a base" and "a knotless base": Defendants 1) raised that portions of the specification seek to define the term "base" and 2) cited to the prosecution history of U.S. Patent Application Ser. No. 17/003,853 where the patent office interpreted "formed by at least an application of heat" to mean "base is formed by heat fusing."  As these arguments were not raised in Defendants' brief and the prosecution history was not placed in evidence, the Court will not consider them.  *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137 (S.D.N.Y. 2008) (declining to consider argument raised for the first time at oral argument).

The language should be given its plain and ordinary meaning.  Lashify's expert opined that a POSITA at the time would understand "application of heat" to mean "that heat is applied to the materials."  Dkt. No. 71-9 ¶¶ 28–29.  It is not limited to the use of heat to melt the materials. The terms are readily understood and claim construction is unnecessary.

Defendants' proposed interpretation would improperly add a "melting" limitation to Claims 1 and 3 of the '020 patent that is not contained in the claim language and is inconsistent with both the claim language and the specification.  The claim language speaks generally to the "application of heat" and is not limited to the melting of artificial hair.  Heat can be applied to melt the artificial lashes or hair.  Dkt. No. 71-2 at 7:32-34.  But, as the specification makes clear, heat can be applied in a number of ways to connect the lashes to one another without necessarily using melted artificial hair.  The specification describes several examples of applying heat to form, connect, and attach the artificial hairs to one another.  For example, "the multiple clusters could be connected together using a glue or some other adhesive composed of various substances.  In such embodiments, the clusters may be exposed to a curing assembly (e.g., a heater, dryer, or light source) that causes the adhesive to solidify."  Dkt. No. 71-2 at 8:3–7.  Defendants' claim construction would exclude that embodiment in violation of the presumption "against a claim construction that excludes a disclosed embodiment."  *Nobel Biocare Servs. AG*, 903 F.3d at 1382; *See Verizon Servs. Corp.*, 503 F.3d at 1305 (rejecting construction that excludes embodiment disclosed in specification); *Invitrogen Corp.*, 327 F.3d at 1369 (same); *see also* Dkt. No. 71-2 at 3:8-10 (noting "[f]or example, the multiple clusters can be fused together (e.g., via a heat seal process)" as an alternative to a hot melt process).

Defendants' construction would also make independent Claim 1 inconsistent with dependent Claims 10, 11 and 12.  Dependent claims "are presumed to be of narrower scope than

the independent claims from which they depend," *Sprint Spectrum L.P. v. General Access Solutions, Ltd.*, 812 Fed. App'x 999 (Fed. Cir. 2020) (quoting *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1242 (Fed. Cir. 2003)), "so if a dependent claim reads on a particular embodiment of the claimed invention, the corresponding independent claim must cover that embodiment as well," *Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022).

Under the plain and ordinary meaning of "an application of heat," Claim 1 of the '020 patent would cover the embodiments described in dependent Claims 10, 11, and 12.  Claim 10 contains the limitation that the application of heat "facilitates at least a partial melting," Claim 11 contains the limitation that the application of heat involves "heat fusing" and Claim 12 contains the limitation that the application of heat involves "heat sealing."  Dkt. No. 71-2 at 10:7–14. Defendants' construction would make Claim 10 superfluous and would exclude the embodiments provided in Claims 11 and 12.  If the application of heat in Claim 1 is construed to mean "melting," Claim 10 would not narrow the scope of the patent or read on a particular embodiment: the limitation of Claim 10 would be equivalent to the limitation of Claim 1.  Under Defendants' construction, Claim 1 would not include "heat fusing" or "heat sealing" as an application of heat.  Claims 11 and 12 thus would be meaningless in violation of the cannon that claim construction that renders dependent claims meaningless is generally disfavored.  *Littelfuse*, 29 F.4th at 1380; *see also Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1378 (Fed. Cir. 2018) (rejecting construction that would contradict embodiments included in both the specification and dependent claims, and therefore render dependent claims meaningless); *Trs. of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1370 (Fed. Cir. 2016) (". . . construing the independent claim to exclude material covered by the

26

dependent claim would be inconsistent."); *Rambus Inc. v. Infineon Technologies Ag*, 318 F.3d 1081, 1093 (Fed. Cir. 2003) (finding district court's construction erroneous where it would render claim language in dependent claims meaningless); *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed. Cir. 1997) ("[W]e must not interpret an independent claim in a way that is inconsistent with a claim which depends from it."). The language in the dependent claim would be meaningless because it would not narrow anything contained in the independent claim.

Lastly, by construing Claims 1 and 3 of the '020 patent to have the same meaning, Defendants' construction runs counter to the principle of claim differentiation. The doctrine of claim differentiation provides that "each claim in a patent is presumptively different in scope." *RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1263 (Fed. Cir. 2003) (citing *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001)). The doctrine applies "where 'there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, and that limitation is the only meaningful difference between the two claims.'" *Id.* Whereas Claim 1 of the '020 patent provides that "at least some of the artificial hairs are connected *to one another* at a respective part of the base by at least an application of heat," Claim 3, which depends from Claim 1, provides a further limitation wherein "the *base* of each of the plurality of lash extensions is formed by at least the application of heat." Dkt. No. 71-2 at 9:8–27 (emphases added). Defendants' construction of these claims improperly reads the limitation of Claim 3 into Claim 1 by solely addressing the formation of the base through heat and equates the claims by proffering a single construction for each, rendering dependent Claim 3 meaningless.

27

The plain and ordinary meaning of "application of heat" is consistent with the specification, Dkt. No. 71-2 at 7:58–8:13, and the dependent claims, Dkt. No. 71-2 at 10:7–14, both of which provide varied examples of how heat can be applied to create a lash fusion. The words of the term are in common use and require no construction.

### D.    "protrude . . . in a pattern"

Claim 8 of the '290 patent recites "plurality of clusters protrude from the knotless base in a pattern along the knotless base." Lashify contends that this claim should be given its plain and ordinary meaning. Defendants' proposed construction of the term "pattern" states: "at least one pair of artificial hairs in a set of pairs of artificial hairs appear at least twice in the lash extension." Dkt. No. 81 at 11–12. The Court concludes that the text should be given its plain and ordinary meaning.

The claims and specification do not indicate that the patentee desired a specialized meaning for the word "pattern." At oral argument, Lashify provided the Merriam-Webster definition of the word pattern ("an artistic, musical, literary, or mechanical design or form") and argued that it should be given its widely-understood plain and ordinary meaning. Similarly, Defendants seek to construe the term "pattern" in accordance with a definition provided by Cambridge Dictionary, as "any regularly repeated arrangement." Dkt. No. 71 at 20–21; Dkt. No. 81 at 12. However, instead of adopting either dictionary's definition, Defendants proposed a construction that would require that "at least one pair of artificial hairs . . . appear at least twice in the lash extension." Neither dictionary defines pattern to require identical repeated shapes or lines.

"Absent an express intent to impart a novel meaning, claim terms take on their ordinary meaning." *Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000). The Court here does not need to resort to anything "more complicated than the common

28

meaning of the words when their meaning is evident and not contradicted by the claims or specification." *3rd Eye Surveillance, LLC v. United States*, 140 Fed. Cl. 39, 65 (Fed. Cl. 2018) (quoting *Fastship, LLC v. United States*, 114 Fed. Cl. 499, 507 (Fed. Cl. 2013)); *see Phillips*, 415 F.3d at 1314 (Fed. Cir. 2005) ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."). Defendants' proposed construction would add a limitation of identical repetition that is not found in the specification, or in the cited extrinsic evidence, and unnecessarily construes a readily understood term. The term "pattern" should be given its plain and ordinary meaning.

### E.    "crisscross"

Claim 8 of the '020 patent recites "one or more of the at least two artificial hairs of a first cluster of the plurality of clusters crisscross one or more of the at least two artificial hairs of a second cluster of the plurality of clusters." Claim 17 of the '290 patent recites "at least one of the artificial hairs of a first cluster of the plurality of clusters crisscross at least one of the artificial hairs of a second cluster of the plurality of clusters." Both claims depend from Claim 1.

Lashify contends that this claim should be given its plain and ordinary meaning. Defendants' proposed construction states: "one artificial hair overlaps another artificial hair in a separate cluster." At oral argument, Defendants expressed that the construction could also state "overlap at an angle with respect to one another," if the initially proposed construction did not represent Plaintiff's intended meaning. Transcript of Oral Argument, Nov. 10, 2025 ("Tr.") at 43:19–21, Dkt. No. 111. Plaintiff maintained their argument for plain and ordinary meaning. Tr. 44:2–6.

The Court adopts the plain and ordinary meaning of "crisscross." The term is common and well understood, and therefore construction is not necessary. *Parking Tech. Holdings LLC v. Park Assist, LLC*, 2024 WL 1885334, at *8 (S.D.N.Y. Apr. 30, 2024) ("The Court concludes that construction of the first disputed term is not necessary, as the term [is] readily understandable to a person of ordinary skill in the art and, indeed, by a layman."). Defendants' construction would create, rather than resolve, uncertainty.

The Court therefore adopts the plain and ordinary meaning of each term in the '020 and '290 patents.

## II.    Claim Construction for D'333 and D'374 Patents

Defendants offer detailed written constructions for both the D'333 and D'374 Patents. Dkt. No. 71 at 22–23. Defendants argue that these constructions are needed to resolve the inconsistencies in each patent, and alternatively argue that these inconsistencies cannot be resolved and therefore render each patent invalid as indefinite. Dkt. No. 81 at 12–17. Plaintiff argues that no claim construction is necessary, and that the Design Patents should be construed based on the figures and description within the patents. Dkt. No. 71 at 22–23. The Court will first address the proposed constructions of the Design Patents and then address their validity.

Design patents cover "a new, original and ornamental design for an article of manufacture." 35 U.S.C. § 171(a). "To be ornamental, a design must present a pleasing aesthetic appearance and must not be dictated solely by functional considerations." 8 Chisum on Patents § 23.01. A design patent may contain functional elements, but those elements are not part of the claimed design. *See Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016) ("[T]he scope of a design patent claim 'must be limited to the ornamental aspects of the design.'" (quoting *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1333 (Fed. Cir. 2015))). In sum, while a utility patent "protects the way an article is used and

works (35 U.S.C. 101), . . . a design patent protects the way an article looks (35 U.S.C. 171)."

U.S. Patent & Trademark Office, Manual of Patent Examining Procedure § 1502.01 (9th ed.

2024). "A drawing is an essential element of a design patent application." *Id.* § 1503.

Patent infringement for a design patent involves the same two-part test as for utility

patents: "(1) the court first construes the claim to determine its meaning and scope; (2) the fact

finder then compares the properly construed claim to the accused design." *Lanard Toys Ltd. v.

Dolgencorp LLC*, 958 F.3d 1337, 1341 (Fed. Cir. 2020) (citing *Elmer v. ICC Fabricating, Inc.*,

67 F.3d 1571, 1577 (Fed. Cir. 1995)). However, the standard for infringement of a design patent

is distinct. "An ordinary observer test governs design patent infringement: '[If] in the eye of an

ordinary observer, giving such attention as a purchaser usually gives, two designs are

substantially the same, if the resemblance is such as to deceive such an observer, inducing him to

purchase one supposing it to be the other, the first one patented is infringed by the other.'" *Amini

Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1371 (Fed. Cir. 2006) (quoting *Gorham

Co. v. White,* 81 U.S. 511 (1871)); *accord Lanard Toys*, 958 F.3d at 1341.

"[D]esign patents 'typically are claimed as shown in drawings,' and claim construction

'is adapted accordingly.'" *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir.

2008) (quoting *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1319 (Fed.

Cir. 2007)). "Words cannot easily describe ornamental designs." *Sport Dimension, Inc. v.

Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016); *see* Manual of Patent Examining Procedure

§ 15.59 (9th ed. 2024) ("as a rule the illustration in the drawing views is its own best

description"). Therefore, "the preferable course ordinarily will be for a district court not to

attempt to 'construe' a design patent claim by providing a detailed verbal description of the

claimed design" and instead allow the design to be represented by its illustration. *Egyptian*

31

*Goddess, Inc.*, 543 F.3d at 679.  Indeed, there are risks entailed in creating a written description of the claimed design, "such as the risk of placing undue emphasis on particular features of the design and the risk that a finder of fact will focus on each individual described feature in the verbal description rather than on the design as a whole."  *Id.* at 680.  However, "[w]here a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent."  *Lanard Toys*, 958 F.3d at 1342 (quoting *Sport Dimension*, 820 F.3d at 1320).  In addition, the scope of the claim should be construed to preserve its validity, if possible.  *See Whittaker Corp. v. UNR Indus., Inc.*, 911 F.2d 709, 712 (Fed. Cir. 1990).

In *Lanard Toys*, the Federal Circuit described a district court's analysis as "following our claim construction directives to a tee."  958 F.3d at 1342.  The court below reproduced five exemplary figures from the patent, considered the functional features and purpose of the design and "meticulously acknowledged the ornamental aspects of each functional element" and then considered prior art references.  *Id.* at 1342–43 (internal citation and quotation marks omitted).  Through this process, the court "construed the claim consistent with the drawings and pointed out the ornamental and functional features of the design as well as the various features as they relate to the prior art."  *Id.* at 1343.  The court followed the Federal Circuit's guidance that "[w]hile it may be unwise to attempt a full description of the claimed design, a court may find it helpful to point out, either for a jury or in the case of a bench trial by way of describing the court's own analysis, various features of the claimed design as they relate to the accused design and the prior art."  *Egyptian Goddess*, 543 F.3d at 680.  By highlighting aspects of the design without adopting a written construction, a court makes clear the key features of the design yet avoids the risk of improperly limiting the claim.  *See e.g., Crocs, Inc. v. Int'l Trade Comm'n*, 598

32

F.3d 1294, 1303 (Fed. Cir. 2010) (case highlighted the "dangers of reliance on a detailed verbal claim construction" where construction imposed limitations on the claim that were not present in the design patent's drawings).

### A.        Proposed Construction of the D'333 Patent

Lashify owns the D'333 Patent, entitled "Artificial Lash Extension," which recites one claim for "[t]he ornamental design for an artificial lash extension, as shown and described." Dkt. No. 71-5. The patent includes fourteen exemplary figures, which represent the top left, front, rear, right, left, top, and bottom views of the design, in addition to figures representing those views with "break lines [that] indicate indeterminate length." *Id.* Seven of these figures are reproduced below:



FIG. 1

FIG. 2

FIG. 3



FIG. 4          FIG. 5

FIG. 6          FIG. 7

Lashify argues that no written construction of the claim is necessary, and Defendants

propose the following written description of the claimed design:

> An artificial lash extension that has six pairs of two artificial lashes extending from a base, two pairs of hook-like artificial hairs extending from the base further than the six other shorter pairs, each hook like pair being located inwardly from the outer-most pairs of the six shorter pairs of artificial hairs.
>
> The six pairs and two pair of hook-like artificial hairs lay atop a triangular arrangement of artificial hairs forming diamond-like openings through the lash extension.
>
> The triangular arrangement with diamond like openings formed from artificial hairs lays atop 12 pairs of artificial hairs arranged in a "V" formation that is never longer than the two pairs of hook-like artificial hairs. Only six artificial hairs are visible when the extension is lying flat on a surface while the remainder of the artificial hairs bow to approximately the same height.

Dkt. No. 71 at 22–23.  The Court will not adopt Defendants' proposed construction or undertake

a detailed written description of the D'333 Patent.

34

Defendants' proposed construction creates requirements that are not present in the D'333 Patent's drawings. The proposed language requires "two pairs of hook-like artificial hairs" that are longer than the other artificial lashes. However, the design figures do not require that any lashes be "hook-like" in shape.[4] *See* Dkt. No. 71-5 at Figs. 2–5. Instead, as shown in Figures 4 and 5, the curvature of the lashes follows a steady arc that no ordinary observer would describe as "hook-like." *Id.* at Figs. 4–5. The patent drawings also show two sets of three longer lashes and do not require two sets of two, or "two pairs," of longer lashes. *See id.* at Figs. 2–3, 6–7. The proposed construction also describes a first set of lashes forming a "triangular arrangement of artificial hairs forming diamond-like openings" which "lays atop" a second set of "12 pairs of artificial hairs arranged in a 'V' formation." However, the drawings do not depict a layer of lashes in a "V" formation below a separate set of lashes in a triangular arrangement. As shown in Figure 6, there are approximately fifty-four lashes beneath the top layer of lashes, all of which together create a rough "V" formation with a triangular shape where the lashes intersect. Defendants' proposed construction creates requirements for the design patent that are not included in the figures and are contrary to the claimed invention. Such a construction "could distort the patent design infringement analysis" as it "improperly describes the design that is shown in the patent." *Nike, Inc. v. Skechers U.S.A., Inc.*, 2019 WL 12528983, at *6 (C.D. Cal. Mar. 28, 2019).

---

[4] The only figures where the lashes could be perceived as "hook-like" are Figures 6 and 7. However, these figures show the top and bottom view of the design and the "hook-like" appearance is due to the lashes' length, not their curvature. As shown in Figures 4 and 5, the longer lashes do not extend further outward from the base than the short lashes but rather arc upward and back towards the base.

35

More fundamentally, this type of meticulous analysis goes against the purpose of a design patent. A design patent protects the overall appearance of an object, not the individual features of a design. *Sport Dimension*, 820 F.3d at 1322 ("[D]esign patents protect the overall ornamentation of a design, not an aggregation of separable elements."). "It is the distinctiveness in overall appearance of an object, when compared with the prior art, rather than minute details or small variations in configuration . . . that constitutes the test of design patentability." *Amini*, 439 F.3d at 1371 (quoting in parenthetical *In re Lapworth*, 451 F.2d 1094 (C.C.P.A. 1971)). The question for design patent infringement is whether an ordinary observer, looking at the items in a store or otherwise as a purchaser, and not under a microscope, would confuse the products. *See Lanard Toys*, 958 F.3d at 1341 (noting that infringement is based on the observation of "an ordinary observer, giving such attention as a purchaser usually gives"); *see also Hafco Foundry and Mach. Co., Inc. v. GMS Mine Repair & Maint., Inc.*, 953 F.3d 745, 751 (Fed. Cir. 2020) ("Infringement of a design patent is determined from the viewpoint of the ordinary observer, comparing the patented design with the article's overall appearance"). Thus, the thrust of the claim is not in the precise number or placement of individual lashes, but in the overall form and appearance of the artificial lash extension.

In *Crocs, Inc.*, the Federal Circuit highlighted "the dangers of reliance on a detailed verbal claim construction." 598 F.3d at 1303. There, the International Trade Commission had evaluated an infringement claim concerning a design patent for an ornamental footwear design and relied on a detailed written claim construction for the patent. *Id.* The Federal Circuit found that the written claim construction "focused on particular features of the [patent] and led the administrative judge and Commission away from consideration of the design as a whole," as evidenced by the Commission's reliance on two details of the design that were required by the

written claim construction but not by the drawings of the patent.  The Federal Circuit determined that the error "distorts the infringement analysis" and that the claim should have instead been construed as "the design shown in Figures 1–7."  *Id.*  Defendants' proposed construction here invites similar errors by creating requirements for the claim that are not present in the D'333 Patent's drawings.

Recognizing the risks of verbal claim construction, the Federal Circuit has "repeatedly held that tribunals should not treat the process of claim construction in design patent cases as requiring a detailed verbal description of the claimed design."  *LKQ Corp. v. GM Glob. Tech Operations LLC*, 102 F.4th 1280, 1301 (Fed. Cir. 2024) (cleaned up).  The Court therefore declines to adopt a detailed verbal construction of the D'333 Patent.

### B.    Proposed Construction of the D'374 Patent

Lashify also owns the D'374 Patent, entitled "Artificial Lash Extension," which recites one claim for "[t]he ornamental design for an artificial lash extension, as shown and described."  The patent includes seven exemplary figures, which represent the top left, front, rear, right, left, top, and bottom views of the design.  Dkt. No. 71-6.  Those figures are reproduced below:



FIG. 1



FIG. 2

FIG. 3

FIG. 4

FIG. 5

FIG. 6

FIG. 7

Lashify argues that no written construction of the claim is necessary, and Defendants

propose the following written description of the claimed design:

> An artificial lash extension that has five pairs of two artificial lashes extending from a base in a first curved direction, two pairs of four artificial hairs extending from the base in a second curved direction under the five pairs of two artificial hairs and converging towards one another, the two pairs of four artificial hairs extending further than the five other shorter pairs, and six pairs of two artificial hairs extending from a base in a third curved direction under the two pairs of four artificial hairs.

Dkt. No. 71 at 23.

The Court will not adopt Defendants' proposed construction or undertake a detailed

written description of the D'374 Patent.

As with the D'333 Patent, Defendants' proposed construction invites inordinate focus on specific features of the design patent rather than the design as a whole.  The description again introduces new requirements into the patent.  The description requires five pairs of two artificial lashes extending in one curved direction, two pairs of four artificial hairs converging towards one another, and six pairs of two artificial hairs curved in a third direction that are layered under the two pairs of four artificial hairs.  Yet, as shown in Figure 1, the pairs of four artificial hairs that converge towards one another are below the other lashes, not between or above them.  Further, the drawings show twelve pairs of lashes within the claim, totaling twenty-four lashes.[5]  Defendants' description describes a design with thirty lashes.  Using Defendants' proposed construction, even an ornamental design for artificial lashes that mirrors the figures within the patent exactly would not infringe.

The incongruence between the proposed detailed written descriptions and the figures in both the D'333 and D'374 Patents illustrates the Supreme Court's well-established point that a claim in a design patent "is better represented by the photographic illustration than it could be by any description, and a description would probably not be intelligible without the illustration." *Dobson v. Dornan*, 118 U.S. 10, 14 (1886); *see also Sport Dimension*, 820 F.3d at 1320 ("Words cannot easily describe ornamental designs" (citing *Dobson*, 118 U.S. at 14)).  The Court will follow the "preferable course" and not attempt to construe the claim of the D'374 Patent by providing a written description of the claimed design.  *Egyptian Goddess*, 543 F.3d at 679; *Trove Brands LLC v. Jia Wei Lifestyle Inc.*, 2025 WL 1409558, at *7 (S.D.N.Y. May 15, 2025)

---

[5] The broken lines in the figures of the D'374 Patent are not part of the claimed design.  Dkt. No. 71-6 ("The broken lines consisting of evenly spaced lines in the figures show portions of the artificial lash extension that form no part of the claimed design."); 37 C.F.R. § 1.152 ("Broken lines may be used to show visible environmental structure").

(declining to provide a detailed verbal construction and noting that "the Federal Circuit has instructed district courts not to attempt to construe a design patent claim by providing a detailed verbal description of the claimed design." (internal quotation marks and citation omitted)).

### C.     Features of the D'333 and D'374 Patents

In line with the Federal Circuit's guidance, the Court will also assess the functional and ornamental features of the design patents to clarify their scope.  *See Lanard Toys*, 958 F.3d at 1343–44; *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293 (Fed. Cir. 2010) (noting that while district courts will preferably not construe a design patent claim, "there are a number of claim scope issues on which a court's guidance would be useful to the fact finder"); *Times Three Clothier, LLC v. Spanx*, 2014 WL 1688130, at *2 (S.D.N.Y. Apr. 29, 2014) (addressing issues regarding the patents' scope "[i]nstead of attempting to reduce to words the designs at issue, which are best represented by the Patents' drawings").

Only ornamental features of a design patent are within the patent's scope.  *See OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997).  A design is "deemed to be functional when the appearance of the claimed design is dictated by the use or purpose of the article.  If the particular design is essential to the use of the article, it cannot be the subject of a design patent."  *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993) (internal citation omitted).  "When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose."  *Id.*; *see also Ethicon Endo-Surgery, Inc.*, 796 F.3d at 1329.  The function of an artificial lash extension is to attach to the eye and enhance the aesthetic appearance of a person's eyelashes.  In both the D'333 and D'374 patents, the base of the artificial lash extension is drawn in broken lines, to indicate that it does not form part of the claim scope.  Dkt. No. 71-5, 71-6.  The base serves the functional purpose of holding the lashes together and providing a surface for

attachment to the eye, and therefore it is properly excluded from the design patent's scope.  The lashes forming the scope of the design patent serve the aesthetic purpose of enhancing appearance, and there are innumerable ways to achieve this purpose, depending on an individual's aesthetic preferences.  As the configuration of lashes in an artificial lash extension hold a primarily aesthetic purpose, the claimed designs are primarily ornamental and thus part of the claim's scope. *See Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1461 (Fed. Cir. 1997) (design patent for a mold is primarily ornamental because while the mold has a function, "the particular design" of the mold is primary ornamental and the "aesthetic characteristics . . . are not dictated by the function of the article").

Though the Federal Circuit in *Lanard Toys* advised that it may be helpful, at claim construction, to "point out various features as they relate to the prior art," 958 F.3d at 1343, the Court will defer this analysis.  "The limitation in scope of a design patent in light of prior art is necessarily folded into the infringement analysis."  *Shure Inc. v. Clearone*, 2020 WL 6074233, at *8 (D. Del. Oct. 15, 2020) (quoting *Jenny Yoo Collection, Inc. v. Essense of Austl., Inc.*, 2020 WL 263583, at *13 (D. Kan. Jan. 17, 2020)).  Here, where neither party presented arguments regarding prior art references for the Design Patents, the Court will not wade into this analysis prematurely.  *See, e.g., id.* (declining to assess prior art due, in part, to limited arguments regarding prior art); *Reddy v. Lowe's Cos., Inc.*, 60 F. Supp. 3d 249, 254, 258–59 (D. Mass. 2014) (declining to consider prior art when construing the design patent claim because "the discussion of prior art is quite undeveloped" and "not yet fully briefed").  At a later stage, the Court may point out various features of the designs as they relate to prior art where helpful to the jury or to explain the Court's analysis.  *See Egyptian Goddess*, 543 F.3d at 680.

###### D.      Validity of the D'333 and D'374 Patents

Alongside their proposed construction, Defendants challenge the validity of both the

D'333 and D'374 Patents.  Defendants argue that, if the Court declines to adopt a verbal

construction, the patents are invalid as indefinite due to inconsistent use of break lines and

discrepancies in the patent drawings.  Dkt. No. 81 at 12.  Assessing challenges to validity at this

stage aids in claim construction, as "claims are generally construed so as to sustain their validity,

if possible." *Whittaker*, 911 F.2d at 712.

To be valid, a patent must meet the requirement for definiteness under 35 U.S.C. § 112.

In *Nautilus, Inc. v. Biosig Instruments*, 572 U.S. 898 (2014), the Supreme Court established the

standard for definiteness for utility patents, holding that "a patent is invalid for indefiniteness if

its claims, read in light of the specification delineating the patent, and the prosecution history,

fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."

*Id.* at 901.  As with utility patents, a design patent must meet Section 112's definiteness

requirement, which serves to "ensure that the disclosure is clear enough to give potential

competitors (who are skilled in the art) notice of what design is claimed—and therefore what

would infringe." *In re Maatita*, 900 F.3d 1369, 1376 (Fed. Cir. 2018).  Applying *Nautilis* to

design patents, the Federal Circuit held that "a design patent is indefinite . . . if one skilled in the

art, viewing the design as would an ordinary observer, would not understand the scope of the

design with reasonable certainty based on the claim and visual disclosure." *Id.* at 1376–77.

Whereas the description and the claims are of primary importance in evaluating definiteness in

utility patents, the reverse is true of design patents: "disclosure and definiteness are

accomplished by the drawings." 8 Chisum on Patents § 23.04.

"A visual disclosure may be inadequate—and its associated claim indefinite—if it

includes multiple, internally inconsistent drawings." *In re Maatita*, 900 F.3d at 1375.  "But

42

errors and inconsistencies between drawings or the claim language do not merit a § 112 rejection if they do not preclude the overall understanding of the visual disclosure as a whole." *Deetsch v. Lei*, 2024 WL 4700642, at *8 (S.D. Cal. Nov. 6, 2024) (citing *In re Maatita*, 900 F.3d at 1375–76). As the Supreme Court explained in *Nautilis*, "[t]he definiteness requirement . . . mandates clarity, while recognizing that absolute precision is unattainable . . . 'the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter.'" 572 U.S. at 910 (quoting *Minerals Separation, Ltd. V. Hyde*, 24 U.S. 261, 270 (1916)).

Patents carry a presumption of validity, and the party challenging a patent as invalid must prove invalidity by clear and convincing evidence. *Spigen Korea Co. v. Ultraproof, Inc.*, 955 F.3d 1379, 1383 (Fed. Cir. 2020). Where a patent is challenged as invalid for indefiniteness, the party challenging the patent must show that "the 'claim is insolubly ambiguous, and no narrowing construction can properly be adopted.'" *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008) (quoting *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338–39 (Fed. Cir. 2003)).

Defendants' challenge as to the D'333 patent centers on the use of "break lines," which "note indeterminate length," as provided in the patent description. Dkt. No. 71-5. Defendants contend both that the admission of "indeterminate length" indicates inherent indefiniteness, Dkt. No. 81 at 17, and that the break lines intersect the design at different points of the lashes or intersect different lashes across the patent drawings, rendering the design indefinite, *id.* at 13–16.

The placement of the break lines on the patent drawings does not render the patent indefinite. The drawings with break lines, Figures 8 through 14, each have one vertical break line placed approximately at the middle of the drawing and one horizontal break line placed across the lashes. The break lines span the width and length of the figures. *See* Dkt. No. 71-5 at

Figs. 8-14.  Rather than interpreting the break lines to apply only to the portions of the lashes where they intersect, which as noted by Defendants would create the paradoxical situation where "the middle [of a lash] can be of indeterminate length [but] the beg[inning] and end points appear in a fixed arrangement vis-à-vis one another," Dkt. No. 81 at 15, the most natural reading of the break lines is that each of the lashes is of indeterminate length and width, regardless of where the break line intersects the lash on the figure.  In other words, the break lines apply to the figure as a whole.  With this understanding of the break lines, the precise placement of the break lines on the figures does not change the claim of the drawings or render the drawings inconsistent.

The acknowledgement that each of the lashes are of "indeterminate length" does not inherently render the patent indefinite.  *See Alan Tracy, Inc. v. Trans Globe Imports, Inc.*, 60 F.3d 840, 1995 WL 331109, at *3 (Fed. Cir. June 2, 1995) (unpublished table case) (finding no validity issue where patent's figures "illustrate lens panels that are 'broken away to indicate indeterminate length'" and concluding that that the figures "disclose . . . straight extensions of like geometrical shape.").  Design patents only include one claim, *Pacific Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, 739 F.3d 694, 703 (Fed. Cir. 2014), and thus Figures 8 through 14, by accounting for indeterminate length, cannot claim a different design than the design provided in Figures 1 through 7.  Any variation in the lengths or placement of the lashes allowed by the break lines would need to comport with the overall appearance of the design, as provided in the initial seven figures.  To the extent that the break lines could be read to include lashes of any length, width, and size relative to one another, and thus greatly expand the scope of the design, that level of indefiniteness can be resolved by construing the claim more narrowly. *See Microprocessor Enhancement Corp*, 520 F.3d at 1376 ("'[A] claim that is amenable to construction is not invalid on the ground of indefiniteness' if the construction renders the claim

44

definite.") (quoting *Energizer Holdings, Inc. v. Int'l Trade Com'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006)).  The Court thus construes the break lines in the D'333 patent to allow for slight variation in the length and width of each lash and the spacing between them, provided that those variations do not alter the overall appearance of the design.  By allowing for variation, this construction aligns with the purpose of design patents: rather than covering only designs that match the patent drawings with mathematical precision, the patent protects the "overall appearance" of the design, as seen by an ordinary observer.  *See Hafco Foundry*, 953 F.3d at 751.

Defendants also challenge the validity of the D'374 patent due to a discrepancy between Figures 6 and 7 in the patent.  Defendants argue that the discrepancy "cannot be cured through observation of any other figures in the patent" and renders the patent invalid.  Dkt. No. 81 at 17.  The Figures, as annotated by Defendants, are reproduced below:



FIG. 6

FIG. 7

Figure 6 represents a top down view of the claimed design and Figure 7 represents a bottom up view of the design.  Dkt. No. 71-5.  Defendants claim a discrepancy in the circled lashes.  Dkt. No. 81 at 17.  These lashes appear on opposite sides of the design in each figure, but this placement is consistent with the perspectives represented.  In both figures, the lashes circled

45

in red are closer to the center than the lashes circled in blue. At oral argument, Defendants identified for the first time the discrepancy they sought to highlight with these images: In Figure 6, the entire length of the circled lashes is visible in solid lines, which are part of the claimed design. In Figure 7, the bottom portion of those lashes are in broken lines, which are not part of the claimed design. *See* Dkt. No. 71-6 ("the broken lines consisting of evenly spaced lines in the figures . . . form no part of the claimed design"). Defendants argue that Figures 6 and 7 thus claim different designs.

Inconsistent use of broken lines does not inherently render a patent invalid. *Apple, Inc. v. Samsung Elecs. Co.*, 932 F. Supp. 2d 1076, 1085–86 (N.D. Cal. 2013). For a design patent to be indefinite, the errors "must be material and of such magnitude that the overall appearance of the design is unclear." *HR U.S. LLC v. Mizco Int'l, Inc.*, 2009 WL 890550, at *6 (E.D.N.Y. Mar. 31, 2009); *accord Times Three Clothier*, 2014 WL 1688130, at *7. If an error is present in one figure, but the remaining figures of the patent are consistent with each other, the error is inconsequential and does not render the patent invalid. *See HR U.S. LLC*, 2009 WL 890550, at *8 ("Because Figures 2, 3 and 4 are consistent with each other, the inconsistency in Figure 1 is inconsequential and does not render the overall appearance of the design unclear."); *Antonious v. Spalding & Evenflo Cos., Inc.,* 217 F.3d 849, 1999 WL 777450, at *8 (Fed. Cir. 1999) (unpublished table case) (where Figures 2 and 3 of patent "plainly showed" a feature that was allegedly shown inconsistently in Figure 4, "a person of skill in the art would primarily look to Figures 2 and 3 to determine the shape of the [disputed feature], and any associated discrepancies in Figure 4 would not be sufficient to preclude a person from gaining an overall understanding of the total substance of the designs"); *cf. Times Three Clothier*, 2014 WL 1688130, at *7 (patent rendered inconsistent where the inconsistency was present in half of the figures).

46

Figure 7 is the only figure in the D'374 patent where a portion of these four lashes are drawn with broken lines. Every other figure, aside from Figures 4 and 5, which provide a side view where the individual lashes are not readily seen, clearly claims the full length of these lashes: these figures each claim four pairs of lashes angled in one direction, four pairs of lashes angled in the opposite direction, and four pairs of longer lashes converging towards each other. Dkt. No. 71-6 at Figs. 1–3, 6. The sole inconsistency in Figure 7 would not preclude a person of ordinary skill in the art from understanding the overall appearance of the design. *See Samtech LLC v. Brooklyn Armed Forces*, 2025 WL 2960014, at *6 (E.D.N.Y. Oct. 20, 2025) (court noting that the claimed "discrepancies are not readily apparent upon review of the illustrations referenced by defendants in their brief. Such minimal or unapparent differences do not rise to the level of an inconsistency that would 'preclude the overall understanding of the drawing as a whole.'" (quoting *In re Maatita*, 900 F.3d at 1376)). Defendants have not demonstrated with clear and convincing evidence that the D'374 patent includes inconsistencies that render it indefinite.

Considering Defendants' proposed written constructions, the functional and ornamental features of the designs, and Defendants' challenges of indefiniteness, the Court adopts the following constructions for the Design Patents:

D'333 Patent: "the ornamental design for an artificial lash extension, as shown in Figures 1–14, wherein the break lines indicating indeterminate length allow for slight variation in the length or width of the lashes without altering the overall appearance of the design as shown in Figures 1–7."

D'374 Patent: "the ornamental design for an artificial lash extension, as shown in Figures 1–7."

47

**CONCLUSION**

The Court construes the terms of the '020 and '290 patents to have their plain and ordinary meaning and construes the D'333 and D'374 patents as described above.

SO ORDERED.

Dated: December 22, 2025
New York, New York

LEWIS J. LIMAN
United States District Judge